## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____

|  |  |  |
|---|---|---|
| SAMUEL MONTINI et al., | ) | |
| | ) | |
| | ) | **Civil Action No. 12-11296-DJC** |
| **Plaintiffs,** | ) | (consolidated with Civil Action No. |
| | ) | 12-11399-DJC) |
| **v.** | ) | |
| | ) | |
| JOSEPH LAWLER et al., | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| (IN RE MODUSLINK GLOBAL SOLUTIONS, | ) | |
| INC. SHAREHOLDER DERIVATIVE | ) | |
| LITIGATION) | ) | |

_____)

### MEMORANDUM AND ORDER

**CASPER, J.**                                                        **March 26, 2014**

## I.      Introduction

Plaintiffs Samuel Montini and Edward Tansey ("Plaintiffs") have filed this derivative lawsuit on behalf of ModusLink Global Solutions, Inc. ("ModusLink" or the "Company") against the Company's former Chief Executive Officer, Joseph Lawler, its former Chief Financial Officer, Steven Crane, its former President of Global Operations, William McLennan (the "Officers") and its Board of Directors (the "Directors") (collectively "Defendants") for breach of fiduciary duty, waste of corporate assets and unjust enrichment. Defendants have moved to dismiss the Amended Complaint. D. 43; D. 44; D. 48. For the reasons stated below, the Court ALLOWS the motions to dismiss.

## II.     Factual Background

### A.     ModusLink and Its Business

The Court acknowledges that there is a related case before this Court.  In re ModusLink Global Solutions, Inc. Sec. Litig. (Collier v. ModusLink Global Solutions, Inc.), No. 12-cv-11044-DJC (the "Securities Litigation").  Although the facts alleged in the Securities Litigation are substantially similar to those in the instant case, the Court must evaluate Plaintiffs' claims based upon the facts alleged in their complaint in this case.  Accordingly, unless otherwise noted, these facts are based upon the allegations in the complaint and the legal standards that apply to this derivative action.  The Court notes that in the related case, a direct action before this Court, no board demand is required as it is a direct suit pursuant to Section 10(b) of the Exchange Act. See No. 12-cv-11044-DJC, D. 29 (Securities Litigation complaint); cf. Fed. R. Civ. P. 23.1(b)(3) (requiring demand on the board of directors and governing only derivative actions).

Plaintiffs are longtime shareholders of ModusLink, which is a publicly traded "supply chain services company" that procures raw materials for its clients and charges a mark-up to its clients, which comprises ModusLink's profit margin.  D. 36 ¶¶ 2, 19-20.  ModusLink aggregates client orders for a given product, purchasing a large quantity of the product from suppliers and then fulfilling client orders at a mark-up pursuant to contracts with individual clients.  Id. ¶¶ 2-3. In some situations, ModusLink receives rebates from its suppliers when it purchases a large volume of products.  Id.  Plaintiffs allege that ModusLink improperly retained rebates without passing that savings along to clients.  Id.

Many of ModusLink's customers had contracts that required ModusLink's mark-up to be calculated as a percentage of the Company's final cost of raw materials as opposed to the initial contract price per unit.  Id. ¶ 2.  Because of the rebates that ModusLink received from suppliers,

ModusLink's final cost of raw materials was often significantly lower than initial contract price. Id. ¶ 3. Accordingly, ModusLink's contracts with many of its customers required the Company to remit the rebates to its customers. Id.

### B. Fiduciary Duties of the Officers and Directors

Plaintiffs allege that the Officers and Directors owed certain fiduciary duties to the Company. Id. ¶ 34. First, Plaintiffs allege that the Officers and Directors owe ModusLink and its shareholders duties of trust, loyalty, good faith and due care as well as a duty to disseminate promptly accurate and truthful information with regard to the Company's operations, performance, management, projection and forecasts. Id. ¶¶ 34-35.

In addition, Plaintiffs allege that by virtue of their service on the Company's Audit Committee, Directors Bay, Breen, Johnson, Jules, Mardy and O'Donnell owed additional duties to ModusLink. Id. ¶ 36. Plaintiffs identify portions of the Audit Committee's charter that require its members to "review and discuss with the Company's management and independent auditor the Company's audited financial statements." Id. ¶ 37. In addition, the charter requires Audit Committee members to consider whether it will recommend inclusion of the Company's audited financial statements in its annual report and to direct the Company's independent auditor to perform reviews of interim financial information prior to disclosure by the Company and discuss with the Audit Committee any matters identified by the auditor that are required to be discussed by applicable auditing standards. Id. The charter also requires the Audit Committee to coordinate the Board's oversight of financial reporting, disclosure controls and procedures and code of conduct. Id. Finally, the Audit Committee charter required Audit Committee members to be financially literate. Id. ¶ 38.

Plaintiffs allege that the Officers were responsible for preparing financial statements that comply with Generally Acceptable Accounting Principles ("GAAP").  Id. ¶¶ 39-40.  In accordance with their professional duties, the Officers and Directors certified that their financial reporting:  (i) did not contain any untrue statements; (ii) did not omit any statements that would cause statements to be misleading; and (iii) were presented in a fair manner.  Id.

Plaintiffs further allege that the Officers and Directors were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  Id. ¶ 45.

Plaintiffs allege that the Officers and Directors breached their duty of loyalty by "allowing defendants to cause, or by themselves causing, the Company to make improper statements regarding its business prospects" and by failing to prevent other Officers and Directors from taking illegal actions resulting in the Securities Litigation.  Id. ¶ 47.  Plaintiffs allege that the Officers and Directors acted in concert and conspired with one another in furtherance of their common plan.  Id. ¶ 48.

C.    The Alleged Fraud on ModusLink's Customers

The Company typically entered into three types of pricing arrangements:  (i) fixed-price contracts; (ii) cost-plus contracts; and (iii) cost-pass-through contracts.  Id. ¶ 55.  Under a fixed-price contract, the Company's costs in procuring raw materials do not affect the contract price.  Id. ¶ 56.

Under a cost-plus contract, the contract price is based upon the Company's costs in procuring the raw materials plus a pre-negotiated mark-up as a percentage of the Company's costs.  Id. ¶ 57.  For example, suppose ModusLink purchased a component at $100 per box and the client cost-plus model contract stipulated that the Company's mark-up was 10%.  Id.  Per the

terms of the contract, ModusLink would invoice the client at $110, which includes the $100 per-box cost of goods plus $10, which represented the 10% mark-up.  Id.  If costs decreased unexpectedly, however, to $80 based upon a rebate, the 10% mark-up should apply to ModusLink's actual cost of $80 per box, yielding a $8 mark-up instead of the $10 mark-up, for a total price to the customer of $88 per box and yielding ModusLink an $8 profit.  Id.  Suppose, however, ModusLink hid the rebate from its customer.  It could – and, according to Plaintiffs, did – invoice the client at the full cost that it initially quoted to the customer ($110), but only incurred $80 in costs, keeping $30 per box for itself instead of $8.  Id. ¶ 59.  Thus, rebates are highly important to the Company, which operates in a low-margin industry.  Id. ¶ 58.  As alleged, there was tremendous incentive to hide rebates from customers.  Id. ¶ 58.

Similar to a cost-plus contract, in a cost-pass-through contract, the customer agrees to pay ModusLink's costs plus a pre-negotiated flat fee.  Id. ¶ 57.  For example, the Company might invoice its client a $5 flat fee for a $100 purchase for a total of $105.  If, costs decreased unexpectedly to $80 as in the example above, the Company could hide the rebate, still invoice the client $105, but retain the pre-negotiated fee of $5 plus the $20 rebate for a total profit of $25.  Id. ¶ 59.

The Company admitted fault as to its improper retention of rebates in an announcement on June 11, 2012, in which it announced the resignation of Lawler and McLennan along with a wide-ranging Restatement of Earnings in which it would correct financial statements from 2007-2012 that previously reflected the improper retention of rebates.  Id. ¶ 9.  This restatement decimated the Company's value to its shareholders, with the Company losing 35% of its market capitalization in a single day.  Id. ¶ 146.

### D. Alleged Breaches of Fiduciary Duties

#### 1. *Violation of Accounting Principles*

As discussed above, Plaintiffs allege that the Company improperly retained rebates and that the Officers and Directors hid these rebates to realize the cost-savings as revenue in violation of GAAP and Securities and Exchange Commission ("SEC") rules (and the Company's contractual obligations). Id. ¶¶ 64, 65. Specifically, GAAP and SEC rules require that revenue should only be recognized when it is both earned and either realized or realizable. Id. ¶ 64. Purported revenue-generating activities involve "delivering or producing goods, rendering services or other activities that constitute its ongoing major or central operations, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." Id. Accordingly, Plaintiffs contend that because the retention of revenues was booked as revenue and not as cost-savings, this practice violated GAAP and SEC rules. Id. ¶ 66. Plaintiffs further contend that ModusLink's practices violated accounting and reporting principles apart from GAAP. Id. ¶ 71.

#### 2. *Failure to Maintain Internal Controls*

Plaintiffs also allege that the Officers and Directors were required to establish and maintain adequate internal controls pertaining to financial reporting. Id. ¶ 72. In particular, the Directors were required to "establish a corporate environment that promotes timely and effective disclosure . . . fiscal accountability, high ethical standards and compliance with all laws and regulations . . . [and] establish effective systems in place for the periodic and timely reporting to the Board." Id. ¶ 73. Plaintiffs allege that the Officers and Directors breached their fiduciary duties by failing to implement and maintain adequate internal controls over the reporting

process; indeed, Plaintiffs allege that "there were <u>no</u> internal controls to address or reconcile the volume rebates retained by the Company with client contracts." <u>Id.</u> ¶ 74 (emphasis in original).

Plaintiffs point to the Company's Restatement of Earnings where the Company revealed that it "did not maintain adequate internal controls related to . . . the accuracy of allocation of vendor rebates received to the costs incurred under client contracts." <u>Id.</u> ¶ 75. Moreover, the Company stated in its Restatement that it would "implement a new control, whereby the Company reviews and analyzes . . . rebates on a global basis and pricing markups by client each quarter." <u>Id.</u> ¶ 77. Plaintiffs note that the Company's admission that this would be a "new" control admits that "these basic checks and controls were not implemented in the first place." <u>Id.</u>

### 3.    *ModusLink's Alleged Misstatements*

As discussed above, as a result of ModusLink's improper retention of rebates, the Company overstated its revenues and profits. Consequently, during the Class Period, Defendants repeatedly certified the accuracy of the Company's financial results and certified the Company had presented these results in compliance with GAAP rules. <u>Id.</u> ¶ 80. Simply put, Plaintiffs allege that the Company's annual (10-K) and quarterly (10-Q) reports to the SEC during the class period materially misreported the Company's financial results. <u>Id.</u> ¶ 84. Similarly, Plaintiffs allege the Officers and Directors falsely certified the accuracy of the Company's reported earnings on multiple occasions. <u>Id.</u> ¶¶ 87-115.

Plaintiffs also allege that through its securities filings, ModusLink made false statements regarding the Company's profit margin, falsely attributing increases to decreases in cost of revenue. <u>Id.</u> As part of ModusLink's securities filings, the Officers and Directors also executed false certifications regarding the Company's initial controls. <u>Id.</u>

Plaintiffs allege that with respect to these material misstatements, the Officers and Directors acted with conscious disregard of their fiduciary duties because "the Company did not have simple procedures to verify the accuracy of its volume rebate accounting" and as the Directors acknowledged in their Restatement, material misstatements resulted.  Id. ¶ 115. Plaintiffs alleged that the Officers and Directors "knew, or in conscious disregard of their duties failed to know" that the Company was improperly retaining rebates.  Id.

### 4.    *Allegations of Officer and Director Entrenchment*

Plaintiffs allege that even prior to the Company's Restatement of Earnings, large shareholders of the Company urged the replacement of the Directors and members of the Company's management.  Id. ¶ 116.   Nevertheless, the Company responded by adopting a Stockholder Rights Agreement (colloquially known as a "Poison Pill") and fought off a proxy battle to entrench themselves and their control over the Company.  Id. ¶¶ 116-123.  Shareholders strongly criticized these actions.  Id. ¶ 123.

### 5.    *Allegations of Improper Business Practices Surface*

After a continued campaign of allegedly squelching shareholder dissent, the SEC initiated a formal inquiry into ModusLink's business practices on February 15, 2012.  Id. ¶ 124.  The Audit Committee conducted its own internal investigation.  Id.  Several months later, on June 11, 2012, the Company disclosed in the aforementioned press release that they would need to restate five years of financial statements as a result of improperly accounting for volume rebates.  Id. ¶ 126.  The Restatement indicated that the Company had overstated its pretax earnings by 30-45% by overstating its revenue by $32.9 million and net income by $18 million.  Id. ¶¶ 127, 139.  The Restatement also revealed that the Company had understated its operating loss by 17 percent and its total net loss by 8.4 percent.  Id. ¶ 139.  Despite their contemporaneous resignations, Lawler

received a severance package of $1,451,250 plus stock and options and McLennan received a severance package of $450,000. Id. ¶ 131.

The Company engaged in multiple share repurchases during the Class Period. Id. ¶ 141. Meanwhile, as a result of the Company overstating its revenue, the value of the Company was consistently inflated during this time. Id. Thus, when the Company repurchased shares, it did so at "artificially inflated rates." Id. Plaintiffs allege that the Directors knew that these rates were artificially inflated at the time of the share repurchases, which the Directors authorized. Id. ¶ 143.

> 6. *Alleged Damages to ModusLink*

Plaintiffs allege that the breaches of fiduciary duty have caused the Company significant damage including: $65 million or 35% loss in market capitalization, id. ¶ 146; costs incurred from repurchasing $56 million of the Company's own stock at inflated prices, id. ¶ 148; damages for breach of ModusLink's customer agreements, id.; costs incurred due to the Company's need to restate its financial statements, id.; costs incurred in investigating, defending and paying any adverse judgment or settlement in the Securities Litigation, id.; and costs incurred from compensating those who have breached their fiduciary duties to the Company. Id.

**E.   Further Allegations of Demand Futility**

Plaintiffs allege that demand on the Company's Board of Directors would have been futile for a number of reasons. Id. ¶ 143. First, Plaintiffs allege that the Directors face a substantial likelihood of liability as the Board failed to operate with any internal controls regarding the improper retention of rebates. Id. ¶ 154. Plaintiffs further allege that the members of the audit committee ("Audit Committee Defendants"), Breen, Johnson, Jules, Mardy and O'Donnell are particularly culpable because the Audit Committee Charter requires these Board

members to coordinate directors' oversight of financial reporting.  Id.  Moreover, Plaintiffs allege that the Directors face a substantial likelihood of liability for making and failing to prevent false and misleading statements to ModusLink shareholders.  In addition, Plaintiffs allege that Defendants Breen, Jules, Lucente and Mardy are substantially likely to be held liable for authorizing stock repurchases where the value of the Company was artificially inflated.  Id. ¶ 157.  Plaintiffs also allege that demand is futile because the Board decided to provide Lawler and McLennan with undeserved benefits (i.e., severance packages) instead of terminating them for cause, which, Plaintiffs allege, was not a valid exercise of business judgment.  Id. ¶ 158.  As discussed above, Plaintiffs allege that the Board's entrenchment demonstrate that the Directors cannot be expected to act in the best interest of the Company and its shareholders.  Id. ¶ 160. Finally, Plaintiffs allege that the Directors' insurance policies motivated the Board not to bring this action directly against themselves because the Directors' insurance policies provide no coverage for any action brought directly by the Company against them.  Id. ¶ 163.  To the contrary, as Plaintiffs contend, if the suit is brought derivatively, the Individual Defendants' insurance policies will provide coverage.  Id.

## III.    Procedural History

Plaintiffs commenced this action on June 13, 2012.  D. 1.  The Court consolidated this action with two other pending cases, No. 12-cv-11078 and No. 12-cv-11399, on November 13, 2012, appointing Plaintiffs the Lead co-Plaintiffs in this action.  D. 27.  Plaintiffs amended their complaint on March 4, 2013.  D. 36.  Thereafter, Defendants filed three motions to dismiss.  D.

43, D. 44, D. 48.[1]  The Court heard the parties on November 8, 2013 and took these matters under advisement.  D. 65.

## IV.  Discussion

This is a derivative action in which the Company's shareholders have sued its officers and directors on behalf of the company through claims arising under the Delaware common law. D. 36 ¶¶ 165-81.  This is unlike the Securities Litigation in which the plaintiffs in that action have sued the Company, Lawler and Crane directly through claims arising under the federal securities laws.  Securities Litigation, No. 12-cv-11044-DJC, D. 29.  Accordingly, and as discussed further below, the pleading standards differ between these two matters.

### A.  Standard of Review

Defendants argue that Plaintiffs' failure to make demand on ModusLink's Board of Directors necessarily requires dismissal of the Amended Complaint.  To bring a derivative action, Plaintiffs must "state with particularity:  (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  Fed. R. Civ. P. 23.1(b)(3).  "[A] court that is entertaining a derivative action under that statute must apply the demand futility exception as it is defined by the law of the State of incorporation."  Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 108-09 (1991).  ModusLink is incorporated in Delaware. D. 36 ¶ 21.

"A cardinal precept of the General Corporation Law of the State of Delaware is that directors, rather than shareholders, manage the business and affairs of the corporation."  Aronson v. Lewis, 473 A.2d 805, 811 (Del. 1984), overruled on other grounds, Brehm v. Eisner, 746 A.2d

---

[1] The Company, the Board and Crane are represented by the same counsel.  Lawler and McLennan each have separate counsel.

244 (Del. 2000). Accordingly, the Board is responsible for deciding whether to initiate derivative litigation on the Company's behalf. Stone v. Ritter, 911 A.2d 362, 366-67 (Del. 2006). As such, "the right of a stockholder to prosecute a derivative suit is limited to situations where either the stockholder has demanded the directors pursue a corporate claim and the directors have wrongfully refused to do so, or where demand is excused because the directors are incapable of making an impartial decision regarding whether to institute such litigation." Id.

B.    **Plaintiffs Have Not Demonstrated that a Demand on the Board of Directors Would be Futile**

Because Plaintiffs did not make a demand on ModusLink's board, the complaint must plead "particularized factual allegations" establishing that demand should be excused because it was futile. Rales v. Blasband, 634 A.2d 927, 934 (Del. 1993). This particularity requirement "differ[s] substantially from the permissive notice pleadings governed solely by . . . Rule 8(a)." Brehm, 746 A.2d at 254. Under Rales, demand is excused where the complaint "creates a reasonable doubt that, as of the time the complaint is filed, the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." Guttman v. Huang, 823 A.2d 492, 501 (Del. Ch. 2003) (quoting Rales, 634 A.2d at 934). "The Rales test is a two-prong inquiry requiring courts to analyze whether a complaint pleads particularized facts sufficient to demonstrate that either (1) the underlying conduct being challenged renders any of the directors 'interested' and, if so, whether any of the other directors are compromised in their ability to act independently of the interested directors; or (2) at least half of the directors face a sufficiently substantial threat of personal liability as to the conduct alleged in the complaint to compromise their ability to act impartially on a demand." Desimone v. Barrows, 924 A.2d 908, 928 (Del. Ch. 2007). However, where the focus of the alleged wrongdoing arises from nonfeasance rather than misfeasance, courts focus on the second factor.

In re Oxford Health Plans, Inc., 192 F.R.D. 111, 117 (S.D.N.Y. 2000) (citing Rales, 623 A.2d at 934); see also In re Citigroup, Inc., S'holder Derivative Litig., 964 A.2d 106, 121 (Del. Ch. 2009).

To demonstrate a substantial likelihood of directorial liability, "[a] simple allegation of potential directorial liability is insufficient to excuse demand, else the demand requirement itself would be rendered toothless, and directorial control over corporate litigation would be lost." In re Goldman Sachs Grp., Inc. S'holder Litig., No. 5215-VCG, 2011 WL 4826104, at *18 (Del. Ch. Oct. 12, 2011). Rather, as discussed above, Plaintiffs must demonstrate a "substantial likelihood of personal liability." Citigroup, 964 A.2d at 121. The likelihood of personal liability runs to the Board and not to company officers; that is, even if Plaintiffs have alleged facts demonstrating a substantial likelihood of personal liability for the Officers (Lawler, Crane and McLennan), but have failed to demonstrate a substantial likelihood of personal liability as to a majority the Directors themselves, this is not enough to excuse demand. See id. at 132 (noting that the relevance of the "substantial likelihood of liability" is that where it exists, it "would prevent [the directors] from impartially considering a demand").[2]

Plaintiffs cannot rely on allegations that relate to the Board in general. Instead, where shareholders complain that directors abandoned their duties, they must make allegations relative

---

[2] Arguably, the amended complaint alleges a substantial likelihood of personal liability for Lawler, McLennan and Crane. However, they were not all members of the Company's Board of Directors. See D. 36 ¶¶ 23, 30. Moreover, assuming that the amended complaint does allege that Lawler, a member of the Company's Board of Directors, id. ¶ 22, faces a substantial likelihood of personal liability, this alone does not sufficiently allege demand futility. This is because demand is only futile where "a majority of the . . . board faces a substantial likelihood of personal liability as a result of the [conduct pled in the complaint], thus compromising their ability to consider demand impartially." Desimone, 924 A.2d at 914 (citing Rales, 634 A.2d at 934). Here, as discussed below, Plaintiffs fail to allege a substantial likelihood of personal liability for a majority of the Company's Board of Directors. Accordingly, and for the reasons discussed below, Plaintiffs have failed to allege demand futility.

to the individual directors, <u>In re Aff. Comp. Servs., Inc. S'holder Litig.</u>, No. 2821-VCL, 2009 WL 296078, at *10 n.42 (Del. Ch. Feb. 6, 2009), showing that a majority of the Board is subject to a substantial likelihood of liability. <u>Aronson</u>, 473 A.2d at 814-15.

Demonstrating that directors would be deciding to sue themselves is insufficient to show a substantial likelihood of personal liability. <u>Citigroup</u>, 964 A.2d at 121. Moreover, likelihood of directorial liability is "significantly lessened" where, as here, a corporation charter contains an exculpatory provision shielding Board members from liability for breaches of the duty of care. <u>Id.</u>; <u>see also</u> 8 Del. C. § 102(b)(7) (authorizing exculpatory provision);[3] D. 47-2 (corporate charter including exculpatory provision). Accordingly, to show demand futility, Plaintiffs must establish a substantial likelihood of personal liability for a breach of the duty of loyalty or duty of good faith. 8 Del. C. § 102(b)(7); <u>In re Baxter Int'l, Inc., S'holders Litig.</u>, 654 A.2d 1268, 1270 (Del. 1995). In such cases, where shareholder allegations are predicated on a failure to exercise oversight, Plaintiffs must show that "(a) the directors utterly failed to implement any reporting or information system or controls; <u>or</u> (b) having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." <u>Stone</u>, 911 A.2d at 370 (emphasis in original). A failure to exercise proper oversight is "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." <u>In re Caremark Int'l Inc.</u>

---

[3] Section 102(b)(7) authorizes a Delaware corporation's charter to contain: "[a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any transaction from which the director derived an improper personal benefit." Accordingly, gross negligence is exculpated by a § 102(b)(7) provision. <u>McPadden v. Sidhu</u>, 964 A.2d 1262, 1275 (Del. 2008).

Derivative Litig., 698 A.2d 959, 967 (Del. Ch. 1996). It essentially requires Plaintiffs to allege that the Directors knew that their failure to exercise proper oversight caused the Company to make misstatements. Citigroup, 964 A.2d at 128 (noting that "to establish director oversight liability plaintiffs would ultimately have to prove bad faith conduct by the director defendants").

<blockquote>

1. *Plaintiffs' Bald Allegations of Directorial Responsibilities Do Not Demonstrate a Substantial Likelihood of Directorial Liability*
</blockquote>

Plaintiffs allege that a majority of the Directors, and in particular the Audit Committee Defendants, face a substantial likelihood of liability because they served on the Audit Committee when the Company issued false and misleading financial statements. Plaintiffs fault the Audit Committee in particular because the Audit Committee must ensure the integrity of the Company's financial reporting. D. 36 ¶ 154. Accordingly, Plaintiffs argue, the Directors must have consciously disregarded their fiduciary duties and therefore would not be exculpated by 8 Del. C. § 102(b)(7). Id. ¶ 6. However, pleading directorial responsibilities is insufficient to establish a substantial likelihood of liability even where the Company issued multiple years of incorrect financial statements. Caviness v. Evans, 229 F.R.D. 354, 359-60 & n.46 (D. Mass. 2005) (dismissing derivative action) (citing In re Xcel Energy, Inc., 222 F.R.D. 603, 607 (D. Minn. 2004) (discussing Delaware law, finding that generalized statements that Audit Committee members "knew or should have known" of false statements did "not constitute facts pleaded with particularity" and dismissing derivative suit for lack of demand)); Rattner v. Bidzos, No. 19700, 2003 WL 22284323, at *10 n.53 (Del. Ch. Oct. 7, 2003) (dismissing derivative complaint due to lack of demand and noting that conclusory allegations of directors' knowledge of wrongdoing merely based upon positions as directors fails to satisfy the requirement that plaintiffs plead demand futility with particularity); In re Sonus Networks, Inc. Derivative Litig., No. 04-0753-BLS, 2004 WL 2341395, at *1, *4 (Mass. Super. Ct. Sept. 27, 2004) (applying Delaware law and

dismissing derivative complaint due to lack of demand based upon finding that "generalized allegations reflecting poor supervision over financial statements" by Audit Committee members and other directors did not excuse demand)). In <u>Caviness</u>, another judge in this District distinguished two cases, <u>In re Abbott Labs. Derivative S'holders Litig.</u>, 325 F.3d 795 (7th Cir. 2003) and <u>In re Oxford Health Plans, Inc., Secs. Litig.</u>, 192 F.R.D. 111 (S.D.N.Y. 2000). <u>Caviness</u>, 229 F.R.D. at 360. In doing so, the Court pointed out that in both cases, the courts concluded that demand was excused as futile because members of the defendant companies' Audit Committees were not contemporaneously aware of noncompliance with regulations and "repeated representations to the financial markets." <u>Id.</u> (quoting <u>Oxford Health Plans</u>, 192 F.R.D. at 114-15). So too here, Plaintiffs have alleged that ensuring the validity of the Company's financial reporting was well within the Directors' (and in particular the Audit Committee Defendants') responsibilities, but allege no facts demonstrating the majority of the Board's contemporaneous knowledge of the illicit practices engaged in either intentionally or negligently by the Company's officers.[4]

With respect to the Audit Committee Defendants in particular, Plaintiffs' allegations are insufficient to defeat a motion to dismiss. Plaintiffs allege that the Audit Committee Defendants had a "heightened financial literacy." D. 36 ¶ 38. Yet these allegations do not show with particularity that a majority of the Board of Directors is substantially likely to be found liable. <u>Citigroup</u>, 964 A.2d at 134 (finding that demand was not futile even though Plaintiffs pled that members of Audit Committee "knew the relevant accounting standards"). Without an allegation of how the Audit Committee actually functioned, Plaintiffs have alleged no facts with

---

[4] Even the allegations, made with particularity regarding the defendants, the officers, in the (related) Securities Litigation, <u>see</u> Securities Litigation, D. 29 ¶ 166 (summary of confidential witness statements) do not inculpate a majority of the Directors in any intentional wrongdoing. <u>Id.</u>

particularity that show that the Audit Committee members "had clear notice of accounting irregularities," Guttman, 823 A.2d at 507, but failed to take appropriate action.

The cases cited by Plaintiffs for the proposition that committee members who fail to fulfill their duties and allow the Company to violate the law face a substantial likelihood of liability, D. 53 at 27, are inapposite. The complaint in Rosky v. Farha, No. 07-1952, 2009 WL 3853592, at *1-3 (M.D. Fla. Mar. 30, 2009), apparently pleads allegations of insider trading and a breach of the duty of loyalty through an insider transaction among members of the board of directors. Id. Here, Plaintiffs base their allegations based upon negligent – and not intentional – conduct. The complaint in In re Vecco Instruments, Inc., Sec. Litig., 434 F. Supp. 2d 267, 278 (S.D.N.Y. 2006), alleged that the Audit Committee ignored an employee's report that the defendant company was violating federal export laws, which led to continued violations of the law. Id. In this case, Plaintiffs have not alleged facts supporting the notion that the Audit Committee Defendants "recklessly ignor[ed] red flags," id. at 277, signaling ModusLink's failure to comply with its contractual obligations.

> 2.    *Plaintiffs Have Not Alleged with Particularity that the Board Failed to Implement Any Internal Controls*

Plaintiffs allege that the Board utterly failed to implement internal controls to prevent ModusLink's alleged fraud on its customers and by extension, its shareholders. D. 36 ¶ 72. Plaintiffs point to the Company's admissions that it would create "new" controls to address the issue, which they allege suggests the complete absence of internal controls. Id. ¶ 77. The Court does not agree that the Company's admissions on June 11, 2012 support allegations that Directors had implemented no internal controls or that the Board was aware at the time of alleged fraud that the internal controls were inadequate; rather, they admit that, in hindsight, there was an absence of adequate internal controls. Id. ¶ 75. All that remains are generalized

allegations that the Directors were responsible for preventing fraud and failed to do so.  This is insufficient to excuse demand as they amount to nothing more than "[g]eneralized allegations of participation, acquiescence, or approval."  <u>Strong ex rel. Tidewater, Inc. v. Taylor</u>, 877 F. Supp. 2d 433, 447-48 (E.D. La. 2012) (citing <u>Aronson</u>, 473 A.2d at 817; <u>Carauna v. Saligman</u>, No. 11135, 1990 WL 212304, at *4 (Del. Ch. Dec. 21,1990); <u>Werbowsky v. Collomb</u>, 766 A.2d 123, 143–144 (Md. 2001); <u>Kaster v. Modification Systems, Inc.</u>, 731 F.2d 1014, 1018 (2d Cir. 1984); <u>Gaubert v. Fed. Home Loan Bank Bd.</u>, 863 F.2d 59, 65 (D.C. Cir. 1988)).  Although Plaintiffs point to the Directors' responsibility to "execut[e] financial reports, without more [this] is insufficient to create an inference that the directors had actual or constructive knowledge of any illegality."  <u>Wood v. Baum</u>, 953 A.2d 136, 142 (Del. 2008).

In short, Plaintiffs have made no allegations with particularity that members of the Board of Directors "knew that internal controls were inadequate, that the inadequacies could leave room for illegal or materially harmful behavior, and that the board chose to do nothing about the control deficiencies that it knew existed."  <u>Desimone</u>, 924 A.2d at 940.  There are no particularized allegations asserting that a majority of directors knew about the rebate program, knew the terms of any of the Company's contracts with its customers or knew that the company was retaining rebates in contravention of its contractual obligations.  Consequently, there are no allegations that the Directors were complicit in the Company's failure to appropriately account for its revenue.  Without these allegations of "scienter" as to the Board, Plaintiffs' argument that demand was futile must fail.  <u>City of Roseville Employees' Ret. Sys. v. Crain</u>, No. 11-2919, 2011 WL 5042061, *6 (D.N.J. Oct. 24, 2011) (citing <u>Stone</u>, 911 A.2d at 370 (granting motion to dismiss based upon absence of any showing that the directors knew that they were not discharging their fiduciary duties" and "suggesting a conscious decision to take no action in

response to red flags" of wrongdoing within the company)); see also Desimone, 924 A.2d at 940 (noting that "Delaware courts routinely reject the conclusory allegation that because illegal behavior occurred, internal controls must have been deficient, and the board must have known so").

Plaintiffs argue that they have met the criteria for pleading demand futility where their allegations center on a failure to implement internal controls in the face of a known duty to implement them. D. 53 at 20. However, the cases upon which Plaintiffs rely do not excuse the requirement that Plaintiffs "allege with particularity the . . . reasons for the plaintiff's failure to [make demand]." Stone, 911 A.2d at 367 (citation omitted). As discussed above, Plaintiffs rely upon a series of conclusory allegations that ModusLink must have lacked "any" internal controls. D. 36 ¶ 5. Contrary to Plaintiffs' suggestion, this is not a case where "a large number of reports [including FDA violation notices and warning letters and reports to compliance personnel warning of illegal activity] made to members of the board from which it may reasonably be inferred that they all knew of [the Company's] continued misconduct and chose to disregard it." In re Pfizer Inc. S'holder Derivative Litig., 722 F. Supp. 2d 453, 460 (S.D.N.Y. 2010). Such allegations are not in the complaint. Accordingly, Plaintiffs' allegation fall short of showing that a majority of the Directors face a substantial likelihood of personal liability.[5]

---

[5] Reliance on Miller v. Schreyer, 200 A.D.2d 492 (N.Y.A.D. 1994), does not aid Plaintiffs, as the complaint in that case apparently alleged that the defendant-directors were complicit in a scheme to defraud shareholders. Id. at 492 (discussing allegation that "directors facilitated the perpetration of a $900 million illegal securities 'parking scheme'"); id. at 495 (discussing alleged "malfeasance" of directors). The Court also notes that Miller has been "criticized as wrongly decided by both [the New York] Court of Appeals and the Delaware Court of Chancery." See Wilson v. Tully, 243 A.D.2d 229, 237 (N.Y.A.D. 1998) (collecting cases). In addition, Plaintiffs' citation to Loizides v. Schramm, No. 37-20100-00097952-CU-BT-CTL (Cal. Super Ct. Aug. 12, 2011) (unpublished), D. 53-2, does not compel a different outcome, where that two-page decision fails to provide any insight into plaintiffs' allegations that demonstrate demand futility.

Similarly, there are no allegations that the Directors knew that the Company made any misstatements to its shareholders.    Plaintiffs allege that the Defendants made false and misleading statements about ModusLink's accounting practices, representing that the Company's financial statements conformed to GAAP and SEC regulations.  D. 36 ¶ 80.  Plaintiffs further allege that the Directors made misstatements about the Company's financial results.  Id. ¶ 84.  In both cases, the only evidence supporting allegations that the Directors were not acting in good faith are that they "signed misleading SEC filings" which "adds little to the demand futility analysis."  Morrone ex rel. Arotech Corp. v. Erlich, No. 09-1910, 2011 WL 1322085, at *7 (E.D.N.Y. Mar. 31, 2011) (citing Seminaris v. Landa, 662 A.2d 1350, 1354 (Del. Ch. 1995)).  Plaintiffs' allegations therefore fail to demonstrate an absence of good faith on the part of the Directors.

Plaintiffs argue that the Audit Committee Defendants are liable for the publication of group-published information despite the fact that outside directors are typically not held liable for false statements in annual reports, press releases and the like.  D. 53 at 34.  "Where outside directors either participate in the day-to-day corporate activities, or had a special relationship with the corporation, such as participation in preparing or communicating group information at particular times, however, the group pleading presumption may apply."  Mitzner v. Hastings, No. 04-3310, 2005 WL 88966, at *6 (N.D. Cal. Jan. 14, 2005).  Plaintiffs ostensibly argue that membership on the Audit Committee suffices to plead such a special relationship.  Id.; D. 53 at 34.  However, cases upon which Mitzner relies for the proposition that membership on the Audit Committee "may suffice in pleading such a special relationship," Mitzner, 2005 WL 88966, at *6, address liability under Ninth Circuit law for control persons under §§ 10(b) and 20(a) of the

Exchange Act and do not address the requirements for demand futility under Delaware law. See In re Livent, Inc., Sec. Litig, 78 F. Supp. 2d 194, 222 (S.D.N.Y. 1999); In re Gupta Corp. Sec. Litig., 900 F. Supp. 1217, 1230 (N.D. Cal. 1994). Accordingly, they are inapposite.

Plaintiffs also cite Ryan v. Gifford, 918 A.2d 341, 356 n.38 (Del. Ch. 2007) for the proposition that "members of the audit committee [are] directly responsible for approving any false financial statements that resulted from mischaracterization of these option grants [and therefore] might be exposed to potential criminal liability for securities fraud, tax fraud, and mail and wire fraud." Id. (finding sufficient allegations to suggest impartiality of considering demand). Ryan, however, addressed the Board's approval of stock-options backdating that violated the "clear letter of shareholder approved" compensation plans. Id. at 346. To that end, each form of criminal liability discussed in Ryan necessarily requires intentional conduct. See 18 U.S.C. §§ 1341, 1343, 1348; 26 U.S.C. § 7201. Plaintiffs have alleged no such conduct here.

### 4.    ModusLink's Repurchase of Its Own Stock at Inflated Values Does not Demonstrate a Substantial Likelihood of Directorial Liability

Plaintiffs also allege that the Directors face a substantial likelihood of individual liability for causing Moduslink to repurchase shares of its own stock at artificially inflated prices during the Class Period. However, such allegations "fail[] to establish demand futility" where there are insufficient particularized allegations that the Directors "knew the underlying information that rendered the stock artificially inflated." Kococinski v. Collins, 935 F. Supp. 2d. 909, 925 (D. Minn. 2013). As discussed above, Plaintiffs' allegations that the Directors acted with conscious disregard of their duties have not been pled with particularity and, therefore, fail to meet the standard provided in Fed. R. Civ. P. 23.1 (requiring Plaintiffs to plead allegations with particularity).

5.    *The Nature of Plaintiffs' Insurance Coverage Does Not Demonstrates the Board's Inability to Consider Objectively a Demand to the Board*

Plaintiffs allege that demand is futile because Defendants' insurance policies might compel the Board not to bring this action directly against themselves. That is, the Individual Defendants' insurance policies provide no coverage for any action brought directly by the Company against them. D. 36 ¶ 163. To the contrary, as Plaintiffs also allege, if the suit is brought derivatively, the Individual Defendants' insurance policies will provide coverage. <u>Id.</u> However, "[d]emand futility based on the existence of an 'insured vs. insured' exclusion in the Company's directors' and officers' liability policies is an 'argument [that] has been rejected repeatedly under Delaware law.'" <u>In re AIG, Inc. Deriv. Litig.</u>, 700 F. Supp. 2d 419, 433 (S.D.N.Y. 2010) (citation omitted); <u>see also</u> <u>Caruana</u>, 1990 WL 212304, at *4. In addition, even if the Court did consider the ways in which Defendants' insurance coverage could play a role in the Board's decision-making process, the Court notes that the "insured vs. insured" exclusion would not have served to discourage the Board from suing the Officers directly (as opposed to the Board members themselves).

6.    *Plaintiffs' Allegations of Entrenchment Do Not Demonstrate that the Board Lacks Independence*

Plaintiffs allege that the Company's "poison pill" strategy militates against a finding that the Board is independent. D. 36 ¶ 116. The adoption of a poison pill can demonstrate sufficient entrenchment to call into question the objectivity of the Board, though such instances often involve attempts to fend off takeover bids.[6]  <u>Moran v. Household Int'l, Inc.</u>, 490 A.2d 1059,

---

[6] Indeed, the cases cited by Plaintiff arise in the takeover context. <u>Carmody v. Toll Bros., Inc.</u>, 723 A.2d 1180, 1183 (Del. Ch. 1998) (noting that poison pill was adopted to protect against risk of takeover); <u>Benihana of Tokyo, Inc. v. Benihana, Inc.</u>, 891 A.2d 150, 176-77 (Del. Ch. 2005) (concluding that a majority of the directors were independent and disinterested).

1071 (Del. Ch. 1985), aff'd, 500 A.2d 1346 (Del. 1985). However, even in the takeover context, a poison pill in itself does not excuse demand. Coates v. Netro Corp., No. 19154, 2002 WL 31112340 (Del. Ch. Sept. 11, 2002). That poison pills would negate a finding of Board independence in the takeover context is logical given that shareholder derivative actions in the takeover context emanate from allegations that by rendering the company "takeover proof," management "eliminates the competitive climate which maximizes share ownership value to stockholders." Moran, 490 A.2d at 1067. Yet the fact that the Company adopted the poison pill does not make it more or less likely that the Directors are ultimately found liable of consciously disregarding their oversight duties. Moreover, Plaintiffs have not identified a case in which the use of a poison pill demonstrated demand futility in a case where the allegations centered on the Board's failure to exercise its oversight duties.

Similarly, Plaintiffs noted at oral argument that there were numerous shareholder complaints before the Board, which Plaintiffs suggest excuse demand. D. 66 at 51. However, there has been no showing that those allegations related to rebates, but rather focused on "the precipitous decline in the Company's stock price, misuse of its balance sheet, . . . and poor operating performance." D. 36 ¶ 118. In fact, counsel for the Company has represented that the shareholder complaints relate to "potentially poor balance sheets because of acquisitions and mergers." Id. at 53-54.

To the contrary, the fact that the Lawler and McLennan left the Company following the June 2012 disclosure of alleged wrongdoing demonstrates a lack of entrenchment by the Board. Even where companies provide significant severance packages to departing officers, this does not conclusively excuse demand. Indiana Elec. Workers Pension Trust Fund, IBEW v. Dunn,

352 Fed. App'x 157, 161 (9th Cir. 2009) (affirming dismissal for failure to make demand despite

Board's $21 million severance package awarded to departing chief executive officer).

Plaintiffs argue that the severance packages and the Board's choice to indemnify Lawler

were not valid exercises of the Board's business judgment. "In the absence of fraud, [Delaware

courts'] deference to directors' business judgment is particularly broad in matters of executive

compensation. In re Walt Disney Co. Derivative Litig., 731 A.2d 342, 362 (Del. Ch. 1998), aff'd

in part, rev'd in part and remanded sub nom. Brehm v. Eisner, 746 A.2d 244 (Del. 2000). To

succeed by demonstrating that an executive compensation decision was not a valid exercise of

business judgment, a plaintiff must show that the Board's decision was irrational or not made in

good faith. Brehm, 746 A.2d at 264. Here, Defendants correctly point out that the Amended

Complaint does not plead particularized facts that demonstrate how the Directors violated those

duties in this regard. D. 46 at 32. As such, Plaintiffs have not pled what information was

available to the Board and do not discuss the Board's decision-making process. On this record,

the Court cannot say that Plaintiffs have shown a substantial likelihood of liability based upon

the Board's decision to award severance pay, particularly when the Company had pre-existing

severance agreements with Lawler and McLennan and a pre-existing Indemnification Agreement

with Lawler. Id.[7]

---

[7] Although Plaintiffs have asked for leave to amend the amended complaint if the Court
grants the motion to dismiss, D. 53 at 45 n.44, the Court cannot presently conclude that such
amendment would not be futile. First, Plaintiffs have already had one opportunity to amend their
complaint once. D. 32, 36. Second, the allegations in the amended complaint are quite detailed,
but as discussed above, do not demonstrate that demand on the Board of Directors would have
been futile and there was no indication in Plaintiffs' papers or at oral argument that Plaintiffs
could proffer additional facts demonstrating same. Accordingly, it appears, at least on the record
now before the Court, that amendment would be futile. See Kanter v. Barella, 489 F.3d 170, 181
(3d Cir. 2007) (affirming district court's dismissal and denial of leave to amend where plaintiff
"offered no new facts demonstrating demand futility" at oral argument); Halpert Enterprises, Inc.
v. Harrison, No. 06-2331, 2007 WL 486561, at *7 (S.D.N.Y. Feb. 14, 2007) (denying leave to

**C.      The Court Dispenses with Analysis of the Remaining Grounds for Dismissal**

Defendants have asked the Court to dismiss this action on a variety of other grounds separate and apart from demand futility.  However, as the Court finds that Plaintiffs should have demanded that the Board institute litigation prior to suit, the Court need not reach Defendants' remaining arguments.  See Howe v. Bank for Int'l Settlements, 194 F. Supp. 2d 6, 14 n.8 (D. Mass. 2002); Morgan v. Driscoll, No. 98–10766–RWZ, 2002 WL 15695, at *6 (D. Mass. Jan. 3, 2002).

**V.      Conclusion**

For the above reasons, the Court ALLOWS Defendants' motions to dismiss, D. 43; D. 44; D. 48.

    **So Ordered.**

                                                              /s/ Denise J. Casper
                                                              United States District Judge

---

amend where it was "unlikely new facts will come to light regarding [the Company's] directors' actions that might help Plaintiff meet the pleading bar for derivative actions").  The Court DENIES without prejudice Plaintiffs' request for leave to amend the complaint.